IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Cranel Inc.,

      Plaintiffs,

      v.

Pro Image Consultants Group, LLC, et al,

      Defendant.

Case No. 2:13-cv-766

Judge Graham

Magistrate Judge Abel

## OPINION AND ORDER

This matter is before the Court on the Defendants' Partial Motions to Dismiss (docs. 39, 40, & 42). For the reasons that follow, the Court will GRANT the Defendants' Motions and DISMISS the remaining state law claims WITHOUT PREJUDICE.

## I.      Background

The following allegations are taken from the Plaintiff's Amended Complaint (doc. 36).

The Plaintiff, Cranel Inc., is an Ohio corporation that provides information technology solutions and services to customers throughout North America. Am. Compl. at ¶ 11, doc. 36. The Plaintiff specifically provides enterprise content management (ECM) software and hardware that allows customers to scan, capture, manage, and store documents. Id. In addition, the Plaintiff offers customer support services and technology maintenance and management services. Id.

V-CARE is an all-inclusive technology and maintenance service offered by the Plaintiff. Id. at ¶ 12. The Plaintiff prices V-CARE for each customer based on a number of factors using a confidential and proprietary pricing tool. Id. at ¶¶ 13–14. Among other security measures, the

Plaintiff restricts employee access to the pricing tool and stores the pricing tool on its computer system. Id. at ¶ 16.

Defendant Pro Image is a Connecticut-based corporation that provides document imaging services to customers. Am. Compl. at ¶ 20. From October 2000 to April 2012, Defendant Pro Image was a customer of Cranel, re-selling the V-CARE service from 2006 to the spring of 2012. Id. During the relevant time period, Defendant Richard Morin was the President of Defendant Pro Image. Defendant Frank Damico worked for the Plaintiff from October 17, 2005 to July 10, 2012, initially as a district manager and later as the National Sales Manager for the Plaintiff's V-CARE business. Id. at ¶ 18. As National Sales Manager, Defendant Damico was in charge of sales of V-Care in the United States and Canada. Id. at ¶ 19. Defendant Damico interacted with Defendant Morin on a regular basis concerning Defendant Pro Image's reselling of V-Care. Id. at ¶ 21. According to the Plaintiff, in late 2011 and early 2012, Defendants Pro Image, Morin, and Damico entered into a conspiracy to misappropriate the Plaintiff's proprietary customer and pricing information, which they then used to compete with the Plaintiff for technology service and maintenance contracts. Id. at ¶ 23. Defendants Matthew Brown[1] and Joshua Fetter joined the alleged conspiracy in 2012. Id. Defendants Damico, Fetter, and Brown are Ohio residents.

In January 2012, Defendant Pro Image began to compete with Cranel for new technology maintenance contracts and for contracts with existing Cranel customers. Id. at ¶ 24. Defendant Pro Image's contract proposals indicated detailed knowledge of the Plaintiff's own contracts with its customers. Am. Compl. at ¶ 27. Defendant Pro Image's contract proposals resembled the Plaintiff's proposal form. Id. After further investigation, the Plaintiff determined that its

---

[1] Defendant Brown worked for the Plaintiff from 1998 through January 2012. Id. at ¶ 17. After his termination in January 2012, he began working for Defendant Pro Image. Id. at ¶ 25. During his employment with the Plaintiff, Defendant Brown worked in a variety of sales positions in which he sold, among other products and services, the Plaintiff's V-CARE service. Id. Defendant Brown's employment with the Plaintiff ended on January 20, 2012. Id. at ¶ 22. At the time of his termination, Defendant Brown signed a Confidential Severance Agreement and Release and Waiver of All Claims. Id.

proprietary business documents and information were being shared with Defendant Pro Image. Id. at ¶¶ 28–29. The Plaintiff terminated its business relationship with Defendant Pro Image on April 18, 2012. Id. at ¶ 24.

The Plaintiff's internal investigation revealed that, from November 2011 through April 2012, Defendant Damico shared the Plaintiff's proprietary information, including V-Care service proposals, with Defendants Pro Image, Morin, Fetter, and Brown. Id. at ¶ 30. During that time period, Defendant Damico and Defendant Morin had more than 30 telephone conversations in which they allegedly discussed their plan to steal the Plaintiff's proprietary information. Id. at ¶ 31. After many of these phone conversations, Defendant Damico emailed the Plaintiff's proprietary information to his personal email address or printed the proprietary information. Am. Compl. at  ¶ 32. Between October 2011 and May 2012, Defendant Damico emailed to his private account twenty different Microsoft Excel, Microsoft Word, and PDF files containing Cranel's proprietary information. Id. These files contained the Plaintiff's V-Care contract renewals and contract proposals, billing information, and product information. Id. at ¶ 33. Defendant Damico was not authorized to take these documents and he purportedly had no business reason to do so. Id. at ¶ 34.

On January 4, 2012, Defendant Damico spoke with Defendant Morin by phone. Id. at ¶ 35. After that phone conversation, Defendant Damico emailed multiple documents containing the Plaintiff's proprietary information to his personal account. Id. Included in these documents was the Plaintiff's pricing spreadsheet for V-Care products, which included its proprietary pricing formula. Id. Defendant Damico was not authorized to access the proprietary pricing formula. Am. Compl. at ¶ 36. The Plaintiff stored its pricing tool in a secure computer directory and limited access to that tool. Id. Because he lacked authority to access the pricing tool directly,

Defendant Damico persuaded a colleague authorized to access the pricing tool to email it to him. Id. The other documents obtained by Defendant Damico included information about the Plaintiff's customer contacts, the customer's equipment models and serial numbers, and the dates on which the customers' contracts with the Plaintiff terminated. Id. at ¶ 35. Defendant Pro Image subsequently used that proprietary information in competing with the Plaintiff for new and existing customers. Id. at ¶¶ 37–39.

On January 6, 2012, a new telephone number was added to Defendant Damico's cellular telephone plan. Id. at ¶ 40. Defendant Damico or Defendant Fetter, an employee of Defendant Pro Image, began to use that telephone number to solicit business on behalf of Defendant Pro Image. Am. Compl. at ¶ 41. Specifically, Defendant Damico or Defendant Fetter would contact the Plaintiff's customers; represent that they were Josh Fetter, a former employee of the Plaintiff; gather information on the Plaintiff's customers; and solicit business from those customers on behalf of Defendant Pro Image. Id. at ¶¶ 43–49. Over the following six months, the new telephone number was used to contact Defendant Morin and Defendant Brown on a regular basis. Id. at ¶ 42.

After completing its investigation, the Plaintiff terminated Defendant Damico's employment on July 10, 2012. Id. at ¶ 50. Shortly thereafter, Defendant Damico began to officially work for Defendant Pro Image. Id. at ¶ 51. Subsequently, Defendant Damico became an officer and part owner of Defendant Pro Image. Id. at ¶ 52. Prior to the spring of 2012, Defendant Pro Image sold services only to end user customers located in New England. Am. Compl. at ¶ 53. In the spring of 2012, Defendant Pro Image began to sell its maintenance services to the Plaintiff's customers with whom Defendant Pro Image had no prior relationship. Id.

On August 1, 2013, the Plaintiff filed its Complaint (doc. 1) asserting eleven causes of action against the Defendants. In February 2014, the Plaintiff filed an Amended Complaint (doc. 36) alleging: (1) violation of the Federal Computer Fraud and Abuse Act; (2) violation of the Federal Racketeer Influenced and Corrupt Organizations Act; (3) corrupt activity in violation of O.R.C. § 2923.31; (4) misappropriation of trade secrets; (5) conversion; (6) tortious interference with customer business relationships; (7) unfair competition; (8) civil action for criminal act/willful theft in violation of O.R.C. § 2307.60 & 2307.61; (9) injunctive relief; (10) tortious destruction of evidence/spoliation of evidence; (11) breach of employee duty of loyalty; (12) tortious interference with employment relationship; (13) breach of contract; and (14) tortious interference with contract.

Defendants Pro Image, Morin, Damico, and Brown (the Defendants) subsequently filed partial motions to dismiss (docs. 39, 40, & 42). Defendant Fetter is representing himself *pro se* and has not filed any dispositive motion. The Defendants' motions are fully briefed and ripe for resolution.

## II.    Standard of Review

Federal Rule of Civil Procedure 8(a) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a motion under Rule 12(b)(6) to dismiss a pleading for failure to state a claim, a court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court should construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded

material allegations in the complaint as true. Iqbal, 556 U.S. at 679; Erickson v. Pardus, 551 U.S. 89, 93–94 (2007); Twombly, 550 U.S. at 555–56.

Despite this liberal pleading standard, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678; see also Twombly, 550 U.S. at 555, 557 ("labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do," nor will "naked assertion[s]" devoid of "further factual enhancements"); Papasan v. Allain, 478 U.S. 265, 286 (1986) (a court is "not bound to accept as true a legal conclusion couched as a factual allegation"). The plaintiff must provide the grounds of his entitlement to relief "rather than a blanket assertion of entitlement to relief." Twombly, 550 U.S. at 556 n.3. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679.

When the complaint does contain well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. Though "[s]pecific facts are not necessary," Erickson, 551 U.S. at 93, and though Rule 8 "does not impose a probability requirement at the pleading stage," Twombly, 550 U.S. at 556, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. Iqbal, 556 U.S. at 678-79; Twombly, 550 U.S. at 555–56. This inquiry as to plausibility is "a context-specific task that requires the reviewing court to draw on

its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]'– 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

As a general rule, when ruling on a Rule 12(b)(6) motion to dismiss, a district court may not consider matters outside the pleadings. Winget v. JP Morgan Chase Bank, N.A., 537 F.3d 565, 576 (6th Cir. 2008) (citing Kostrzewa v. City of Troy, 247 F.3d 633, 643 (6th Cir. 2001)). A district court may, however, consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." Henry v. Chesapeake Appalachia, L.L.C., 739 F.3d 909, 912 (6th Cir. 2014) (internal quotation marks omitted). The Court considers the Defendants' Motions to Dismiss with these rules in mind.

## III.  Discussion

The Defendants seek to dismiss Counts One and Two of the Amended Complaint for failure to state a claim. The Court addresses each Count in turn.

### A.  *Count One – Computer Fraud and Abuse Act, 18 U.S.C. § 1030*

The Defendants maintain that the Plaintiff has failed to state a claim against them under the Computer Fraud and Abuse Act (CFAA). According to them, the Plaintiff has not alleged that Defendants Pro Image, Morin, or Brown accessed the Plaintiff's computers. Moreover, they argue, the Plaintiff's allegations are insufficient to establish that Defendant Damico was an agent of Defendants Pro Image and Morin when he accessed the Plaintiff's computers. Finally, the

Defendants argue that the Plaintiff's alleged damages are not the type of loss covered by the CFAA.

In response, the Plaintiff contends that it has alleged sufficient facts to establish that Defendant Damico acted as an actual or apparent agent of Defendants Pro Image and Morin. Consequently, the Plaintiff insists, Defendants Pro Image and Morin are vicariously liable for Defendant Damico's conduct. The Plaintiff also rejects the Defendants' argument concerning its purported failure to allege losses of the kind contemplated by the CFAA. The Plaintiff emphasizes that the CFAA covers a broad range of losses, including costs related to responding and investigating unauthorized access of a plaintiff's computer network. The Plaintiff therefore concludes that it has stated a valid CFAA claim against the Defendants.

"Generally, the CFAA protects against unauthorized computer access." Dice Corp. v. Bold Techs., 556 F. App'x 378, 387 (6th Cir. 2014). "Although the CFAA is mainly a criminal statute, the CFAA permits a person who suffers damage or loss by reason of a violation of this section to maintain a civil action against the violator." Riding Films, Inc. v. White, No. 2:13–CV–00046, 2014 WL 3900236, at *5 (S.D. Ohio Aug. 11, 2014) (citing Jedson Eng'g, Inc. v. Spirit Constr. Servs., Inc., 720 F. Supp. 2d 904, 228 (S.D. Ohio 2010)).

The Plaintiff alleges that the Defendants violated subsection (a)(2)(C) of 18 U.S.C. § 1030, which prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer"; subsection (a)(4), which prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value"; and subsection (a)(5)(B)-(C), which provides for liability on the part of any person who "intentionally accesses a protected

computer without authorization, and as a result of such conduct, recklessly causes damage." To state a claim under each of these subsections, the Plaintiff must allege facts demonstrating that the Defendants knowingly accessed the Plaintiff's protected computers without authorization or exceeded their authorized access.

The allegations before the Court here are consistent with those in cases "in which an employer brings a CFAA claim against an employee who accesses the employer's computer to misappropriate confidential or proprietary business information to start a competing business venture or join a competitor." Ajuba Intern., L.L.C. v. Saharia, 871 F. Supp. 2d 671, 685 (E.D. Mich. 2012). "Courts around the country struggle with whether the CFAA applies in a situation where an employee who had been granted access to his employer's computers uses that access for an improper purpose." Id. The district court in Ajuba International helpfully summarized courts' competing interpretations of the terms "without authorization" and "exceeds authorized access":

> Some courts have construed the terms narrowly, holding that an employee's misuse or misappropriation of an employer's business information is not "without authorization" so long as the employer has given the employee permission to access such information. . . . In other words, courts adopting the narrow approach hold that, once an employee is granted "authorization" to access an employer's computer that stores confidential company data, that employee does not violate the CFAA regardless of how he subsequently uses the information.

> Other courts have construed the terms broadly, finding that the CFAA covers violations of an employer's computer use restrictions or a breach of the duty of loyalty under the agency doctrine. The broad approach holds that an employee accesses a computer without authorization whenever the employee, without the employer's knowledge, acquires an interest that is adverse to that of his employer or is guilty of a serious breach of loyalty.

Id. at 686 (internal citations and quotations omitted).

Numerous district courts within the Sixth Circuit have adopted the narrow interpretation of the phrases "without authorization" and "exceeds authorized access." See Dana Ltd. v. Am.

Axle and Mfg. Holdings, Inc., No. 1:10–CV–450, 2012 WL 2524008, at *4 (W.D. Mich. June 29, 2012) (collecting cases). The Court agrees with these courts that the narrow interpretation is proper under the CFAA.

First, the CFAA's plain language supports a narrow interpretation of the phrases "without authorization" and "exceeds authorized access." "When presented with a matter of statutory interpretation, we begin with the language of the Act itself." Ashland Hosp. Corp. v. Serv. Emps. Intern. Union, Dist. 1199 WV/KY/OH, 708 F.3d 737, 741 (6th Cir. 2013) (collecting cases). "If the meaning of the Act's language is plain, we give it effect and our analysis comes to an end." Id. (citing United States v. Ron Pair Enters., 489 U.S. 235, 240–41 (1989)). "Unless they are otherwise defined, the words in a statute 'will be interpreted as taking their ordinary, contemporary, common meaning.'" Deutsche Bank Nat. Trust Co. v. Tucker, 621 F.3d 460, 462 (6th Cir. 2010). The Ninth Circuit's interpretation of the CFAA is consistent with this approach:

> Authorization is defined in the dictionary as "permission or power granted by an authority." Random House Unabridged Dictionary, 139 (2001); see also Webster's Third International Dictionary, 146 (2002) (defining authorization as "the state of being authorized" and "authorize" as "to endorse, empower, justify, permit by or as if by some recognized or proper authority"). Based on this definition, an employer gives an employee "authorization" to access a company computer when the employer gives the employee permission to use it.

LVRC Holdings L.L.C. v. Brekka, 581 F.3d 1127, 1133 (9th Cir. 2009). See also Pulte Homes, Inc. v. Laborers' Intern. Union of N. Am., 648 F.3d 295, 304 (6th Cir. 2011) (in non-employment related context, adopting the Ninth Circuit's interpretation of "without authorization" under the CFAA in Brekka).

The CFAA's definition of the phrase "exceeds authorized access" provides additional support for the narrow interpretation. The statute defines "exceeds authorized access" as "to

access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

> As this definition makes clear, an individual who is authorized to use a computer for certain purposes but goes beyond those limitations is considered by the CFAA as someone who has "exceed[ed] authorized access." On the other hand, a person who uses a computer "without authorization" has no rights, limited or otherwise, to access the computer in question. In other words, for purposes of the CFAA, when an employer authorizes an employee to use a company computer subject to certain limitations, the employee remains authorized to use the computer even if the employee violates those limitations. It is the employer's decision to allow or to terminate an employee's authorization to access a computer that determines whether the employee is with or "without authorization."
>
> This leads to a sensible interpretation of §§ 1030(a)(2) and (4), which gives effect to both the phrase "without authorization" and the phrase "exceeds authorized access": a person who "intentionally accesses a computer without authorization," §§ 1030(a)(2) and (4), accesses a computer without any permission at all, while a person who "exceeds authorized access," id., has permission to access the computer, but accesses information on the computer that the person is not entitled to access.

Brekka, 581 F.3d at 1133.

Second, to the extent that the language of the CFAA could be considered ambiguous, the CFAA's legislative history provides additional support for adopting the narrow interpretation of the statute. The legislative history indicates that the CFAA was designed to protect computer owners against trespass, Black & Decker (US), Inc. v. Smith, 568 F. Supp. 2d 929, 935–36 (W.D. Tenn. 2008), and "'to create a cause of action against computer hackers (e.g., electronic trespassers),'" Shamrock Foods Co. v. Gast, 535 F. Supp. 2d 962, 965 (D. Ariz. 2008) (quoting Int'l Ass'n of Machinists and Aerospace Workers v. Werner–Masuda, 390 F.Supp.2d 479, 495–96 (D. Md. 2005)).

> Senate report[s have] suggested a difference between access without authorization and exceeding authorized access based on the difference between insiders and outsiders. Insiders were those with rights to access computers in some circumstances (such as employees), whereas outsiders had no rights to access computers at all (such as hackers). . . . Thus, the legislative history confirms that

the CFAA was intended to prohibit electronic trespassing, not the subsequent use or misuse of information.

Shamrock Foods Co., 553 F. Supp. 2d at 966 (internal citations and quotations omitted). This understanding is consistent with the narrow interpretation of the CFAA adopted by the Court here.

Third, the rule of lenity provides additional support for the narrow interpretation of the CFAA. The CFAA is a criminal statute, and "even though it is being applied in a civil context, the Court must apply the rule of lenity, so that the statute is interpreted consistently." Black & Decker (US), Inc., 568 F. Supp. 2d at 935 (citing Leocal v. Ashcroft, 543 U.S. 1, 12 n.8 (2004); Crandon v. United States, 494 U.S. 152, 158 (1990)). Under the rule of lenity, "ambiguities are generally resolved in favor of the party accused of violating the law," United States v. One TRW, Model M14, 7.62 Caliber Rifle, 441 F.3d 416, 420 n.3 (6th Cir. 2006). The narrow interpretation of the CFAA resolves any ambiguities accordingly.

The Court must now determine whether the Plaintiff has pled sufficient facts to state a claim that the Defendants accessed the Plaintiff's protected computers without authorization or in excess of their authorized access. In the instant case, the Plaintiff alleges that Defendant Damico accessed the Plaintiff's computers and e-mailed to himself Microsoft Excel, Microsoft Word, and PDF files containing the Plaintiff's confidential, proprietary, or trade secret information. Am. Compl. at ¶ 32. Further, the Plaintiff alleges, "Defendant Damico did not have Cranel's authorization to take Cranel documents, and he had no business reason to do so." Id. at ¶ 34. In its Amended Complaint, the Plaintiff identifies one instance of particular concern in which Defendant Damico emailed himself a blank V-Care pricing spreadsheet that included the Plaintiff's proprietary pricing tool. Id. at ¶ 35. According to the Plaintiff, Defendant Damico "did not have direct access to Cranel's proprietary pricing tool. In order to gain access to it, he

persuaded another Cranel employee who had access to [it] . . . to email it to Damico's work account." Id. at ¶ 36.

Here, the Plaintiff's allegations are consistent with a scenario in which "an employee who had been granted access to his employer's computers uses that access for an improper purpose," Ajuba Intern., L.L.C., 871 F. Supp. 2d at 685. During the relevant time period, Defendant Damico worked for the Plaintiff as a district manager and later as the National Sales Manager for the Plaintiff's V-CARE business. Am. Compl. at ¶ 18. The Plaintiff does not allege that Defendant Damico accessed its computers without authorization; rather, it alleges that Defendant Damico's use of its business documents was unauthorized. This is not the type of conduct prohibited by the CFAA. "[O]nce an employee is granted 'authorization' to access an employer's computer that stores confidential company data, that employee does not violate the CFAA regardless of how he subsequently uses the information." Ajuba Intern., L.L.C., 871 F. Supp. 2d at 686. See also id. at 687 ("[A] violation for accessing 'without authorization' under the CFAA occurs only where initial access is not permitted").

Nor do the Plaintiff's allegations demonstrate that Defendant Damico exceeded his authorization when he accessed numerous Microsoft Excel, Microsoft Word, and PDF files containing the Plaintiff's confidential, proprietary, or trade secret information, Am. Compl. at ¶ 32. The CFAA defines the term "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). The Plaintiff does not allege that Defendant Damico was not entitled to obtain these documents. Instead, the Plaintiff again asserts that Defendant Damico's actions after obtaining those documents was

unauthorized. This is insufficient to state a claim upon which relief may be granted under the CFAA.

The Courts next considers whether Defendant Damico exceeded his authorization to access the Plaintiff's protected computers when he obtained the Plaintiff's proprietary pricing tool. Although authorized to access the Plaintiff's protected computers, Defendant Damico "did not have access to Cranel's proprietary pricing tool. . . . The proprietary pricing tool is stored in a secure directory in the Cranel system and limited access is granted to only the individuals authorized to access the tool. Damico was not one of the authorized individuals." Am. Compl. at ¶ 36. The Plaintiff's allegations do not demonstrate that Defendant Damico exceeded his authorized access. Instead, the Plaintiff's allegations indicate that Defendant Damico "persuaded" a colleague who did have authorization to access the Plaintiff's proprietary pricing tool to provide him a copy of that tool. Am. Compl. at ¶ 36. Because Defendant Damico did not access the Plaintiff's protected computers in obtaining the proprietary pricing tool, he did not violate the CFAA.

The Plaintiff has failed to state a claim upon which relief may be granted under the CFAA as to Defendant Damico. Because the Plaintiff's CFAA claim against Defendants Pro Image, Morin, and Brown are dependent upon their claim against Defendant Damico, the Plaintiff has failed to state a claim upon which relief may be granted as to these Defendants as well.


B.      *Count Two – RICO*

Next, the Defendants argue that the Plaintiff has failed to plead sufficient facts to state a RICO claim upon which relief may be granted. According to the Defendants, the Plaintiff has not

alleged sufficient facts to establish the existence of an enterprise, a predicate act, or a pattern of racketeering. Further, the Defendants contend, the Plaintiff has failed to plead sufficient facts establishing an agreement among them to engage in illegal activity.

In response, the Plaintiff emphasizes the expansive nature of the RICO statute and insists that it has pled sufficient facts as to each element of a RICO claim.

The Racketeer Influenced and Corrupt Organizations Act provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). To establish a cause of action under § 1962(c), a plaintiff must adequately plead that a defendant engaged in "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" In re ClassicStar Mare Lease Litig., 727 F.3d 473, 483 (6th Cir. 2013) ((quoting Moon v. Harrison Piping Supply, 465 F.3d 719, 723 (6th Cir. 2006)).

Although the Defendants challenge each of these four elements, the Court focuses its attention on the third and fourth elements of the Plaintiff's § 1962(c) claim. The Defendants argue that the Plaintiff has failed to plead sufficient facts establishing the predicate acts necessary to meet RICO's definition of "racketeering activity." In order to establish 'racketeering activity' the plaintiffs must allege a predicate act . . . . under 18 U.S.C. § 1961(1)." Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n, 176 F.3d 315, 322 (6th Cir.1999) (citing Kenty v. Bank One, Columbus, N.A., 92 F.3d 384, 389 (6th Cir. 1996)). Here, the Plaintiff alleges that the Defendants committed wire fraud in violation of 18 U.S.C. § 1343; violated the CFAA, § 18 U.S.C. 1030; and committed obstruction of justice in violation of 18 U.S.C. § 1503.

"Mail fraud and wire fraud are among the enumerated predicate offenses that can constitute 'racketeering activity.'" In re ClassicStar Mare Lease Litig., 727 F.3d at 484  (citing 18 U.S.C. § 1961(1)). To state a RICO claim based on predicate acts of wire fraud, a plaintiff must "adequately allege[ ] a scheme to defraud, the use of the mail or wires in furtherance of the scheme, and a sufficient factual basis from which to infer scienter." Heinrich v. Waiting Angels Adoption Servs., Inc., 668 F.3d 393, 409 (6th Cir. 2012). "A scheme to defraud is any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." In re ClassicStar Mare Lease Litig., 727 F.3d at 484 (internal citations and ellipses omitted). "A plaintiff must also demonstrate *scienter* to establish a scheme to defraud, which is satisfied by showing the defendant acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information." Heinrich, 668 F.3d at 404.

When the predicate act alleged is a fraud-based offense, the "racketeering activity" must be pled with sufficient particularity to meet the heightened standard of Fed. R. Civ. P. 9(b). Arnold v. Alphatec Spine, Inc., No. 1:13–cv–714, 2014 WL 2896838, at *11 (S.D. Ohio June 26, 2014) (citing Brown v. Cassens Transp. Co., 546 F.3d 347, 365 n. 4 (6th Cir. 2008)). Rule 9(b) instructs that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To satisfy Rule 9(b)'s heightened pleading requirements, "the plaintiffs, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation . . . the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" Heinrich, 668 F.3d at 403 (quoting United States ex rel. Bledsoe v. Cmty. Health Sys., 342 F.3d 634, 643 (6th Cir. 2003)). See also Frank v. Dana Corp., 547 F.3d 564, 570 (6th Cir. 2008) (To comply with Rule 9(b), a complaint alleging a fraudulent

representation "must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent"). In short, Rule 9(b) "requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." Williams v. Duke Energy Int'l, 681 F.3d 788, 803 (6th Cir. 2012) (internal quotation marks omitted).

The Court finds that the Plaintiff fails to state a plausible claim of wire fraud under RICO. First, the Plaintiff's allegations fail to plausibly establish a scheme to defraud among the Defendants. Accepting all well-pled allegations as true, it is clear that Defendant Damico obtained the Plaintiff's proprietary business information and provided that information to Defendants Pro Image, Morin, Brown, and Fetter. However, other than the isolated incident in which Defendant Damico fraudulently persuaded a colleague to provide him with the Plaintiff's proprietary pricing tool, the Plaintiff's allegations do not identify any money or property that the Defendants' attempted to obtain by means of false or fraudulent pretenses, representations, or promises. See  In re ClassicStar Mare Lease Litig., 727 F.3d at 484 ("A scheme to defraud is any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises"). The Plaintiff's allegations are consistent with a scheme among the Defendants to misappropriate or steal the Plaintiff's proprietary business information and trade secrets, but they do not support a claim for fraud. The Defendants did not need to resort to fraud to gain access to the Plaintiff's proprietary information. They needed only to misappropriate that proprietary information to which Defendant Damico already had lawful access.

Second, many of the Plaintiff's allegations concerning the Defendants' alleged wire fraud fail to satisfy Rule 9(b)'s particularity requirement. The Plaintiff alleges, "[d]uring and after his

employment with Cranel, Defendant Damico fraudulently represented to Cranel that he would abide by his duty of loyalty to Cranel and not divulge Cranel's trade secrets to third parties." Am. Compl. at ¶ 84. The Plaintiff also alleges that "Defendant Damico fraudulently misrepresented to another employee that he needed a copy of Cranel's proprietary pricing tool for a legitimate business purpose and duped that employee into providing it to him in order to further Defendants' scheme." Id. at ¶ 86. See also id. at ¶ 36 (providing details on Defendant Damico's conduct in obtaining the Plaintiff's proprietary pricing tool). The Plaintiff does not identify with particularity where and when these statements were made. See Frank, 547 F.3d at 570 (To comply with Rule 9(b), a complaint alleging a fraudulent representation "must . . . state where and when the statements were made"). Nor does the Plaintiff identify any injury resulting from Defendant Damico's alleged misrepresentations that he would abide by his duty of loyalty and not divulge the Plaintiff's trade secrets to third parties. Heinrich, 668 F.3d at 403 (To satisfy Rule 9(b)'s heightened pleading requirements, "the plaintiffs, at a minimum, must 'allege . . . the injury resulting from the fraud'" (quoting United States ex rel. Bledsoe, 342 F.3d at 643)). Consequently, these allegations do not comply with Rule (9)(b)'s particularity requirement.

The Plaintiff further alleges, "[n]umerous times throughout the years prior to April 2012, Defendants Pro Image and Morin fraudulently represented to Cranel that they would deal with Cranel fairly and in good faith, and that they would not unfairly compete with Cranel." Am. Compl. at ¶ 85. As with Defendant Damico's alleged misrepresentations, the Plaintiff does not identify with particularity "where and when the statements were made," Frank, 547 F.3d at 570, nor does it specify any injury resulting from the misrepresentations, Heinrich, 668 F.3d at 403. Consequently, these allegations do not comply with Rule (9)(b)'s particularity requirement.

18

Third, the Plaintiff fails to allege sufficient facts to support a finding that it reasonably relied on many of the Defendants' alleged misrepresentations to its detriment. The Plaintiff alleges that "[e]ither Defendant Damico (misrepresenting himself to be an individual named Josh Fetter) or Defendant Fetter misrepresented himself to Cranel customers to be a former Cranel employee." Am. Compl. at ¶ 87. In its Amended Complaint, the Plaintiff identifies two specific instances in which Defendant Fetter (or Defendant Damico posing as Defendant Fetter) contacted the Plaintiff's customers and attempted to solicit their business on behalf of Defendant Pro Image. See id. at ¶¶ 44–49. Any statements made by Defendant Fetter or Defendant Damico in these instances were made to the Plaintiff's customers and not the Plaintiff. Therefore, the Plaintiff's allegations do not and cannot demonstrate that it reasonably relied on those statements and suffered an identifiable injury as a result.

Similarly, the Plaintiff alleges that "Defendant Brown fraudulently represented to Cranel in the Severance Agreement that he would not divulge Cranel's confidential information and trade secrets to third parties." Am. Compl. at ¶ 88. The Plaintiff does not offer allegations to support the conclusion that it reasonably relied on Defendant Brown's representations or that it suffered an identifiable injury as a result of that reasonable reliance. At most, the Plaintiff offers conclusory allegations that, "Cranel reasonably relied upon each of the above representations," id. at ¶ 90. Without additional factual allegations, this bare-bones legal conclusion is insufficient to support a claim of wire fraud as a predicate act under RICO.

Fourth, and finally, the Plaintiff's RICO claims based on wire fraud fail because the Plaintiff offers only a conclusory assertion regarding the Defendants' scienter, stating, without elaboration, "Defendants made each of the above representations with the specific intent to defraud Cranel," id. at ¶ 89. Although the allegations in the Amended Complaint are sufficient to

support the inference that the Defendants intended to misappropriate the Plaintiff's property, they are insufficient to support the inference that the Defendants intended to defraud the Plaintiff.

The Plaintiff's claims that the Defendants violated the Computer Fraud and Abuse Act and committed obstruction of justice are similarly unsuccessful. To its credit, the Plaintiff now concedes that its allegations of obstruction of justice as a predicate act were "misplaced" and does not rely on them to support its RICO claim. Def.'s Resp. in Opp. at 11 n.4, doc. 51. With respect to the Plaintiff's allegations regarding the CFAA, the Court has already concluded that the Plaintiff has failed to state a claim upon which relief may be granted. Therefore, neither the Defendants' alleged obstruction of justice nor their alleged violation of the CFAA constitute predicate acts to support the Plaintiff's RICO claim presently before the Court.

The Plaintiff's allegations fail to establish two predicate acts under RICO that would be sufficient to establish a pattern of racketeering activity. Consequently, the Court will grant the Defendants' partial motions to dismiss as to the Plaintiff's RICO claim.

C.     *Defendant Joshua Fetter*

Defendant Fetter is representing himself *pro se* in the instant action. He has not filed any dispositive motion of his own and has not moved to join the other Defendants' partial motions to dismiss. Nonetheless, the legal issues concerning the CFAA and RICO claims have been fully briefed, Defendant Fetter's interests align with those of the other Defendants, and the basis for the Court's dismissal of those claims applies with equal force to Defendant Fetter. Consequently, this Opinion and Order will apply to all of the Defendants in the instant action. See Melton v. Blankenship, 2009 WL 87472, at *4 (6th Cir. Jan. 13, 2009) (affirming district court's dismissal

of nonmoving parties who were in the same factual and procedural posture as the moving parties); see also Bonny v. Society of Lloyd's, 3 F.3d 156, 162 (7th Cir. 1993) ("A court may grant a motion to dismiss even as to nonmoving defendants where the nonmoving defendants are in a position similar to that of moving defendants or where the claims against all defendants are integrally related"); Silverton v. Dep't of Treasury, 644 F.2d 1341, 1345 (9th Cir. 1981) ("A District Court may properly on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants").

## IV.    Supplemental Jurisdiction

The Plaintiff filed the instant action in this Court based on federal question jurisdiction. Here, the Court concludes that Plaintiff's Amended Complaint fails to state a claim upon which relief may be granted as to its federal law claims under the CFAA and RICO. Consequently, only state law claims remain in the action.[2] "A district court may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it had original jurisdiction." Novak v. MetroHealth Med. Ctr., 503 F.3d 572, 583 (6th Cir. 2007) (citing 28 U.S.C. § 1367(c)(3)). Having considered the "values of judicial economy, convenience, fairness, and comity," Gamel v. City of Cincinnati, 625 F.3d 949, 951–52 (6th Cir. 2010) (quoting Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)), the Court declines to exercise supplemental jurisdiction over the Plaintiff's state law claims and dismisses them without prejudice. See Musson Theatrical, Inc. v. Fed. Express Corp., 89 F.3d 1244, 1254–55 (6th Cir. 1996) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims").

---

[2] The Court cannot exercise jurisdiction over the remaining claims on the basis of diversity jurisdiction because there is not complete diversity between the parties; the Plaintiff and three of the individual Defendants are citizens of Ohio. See 28 U.S.C. § 1332(a)(1).

**V.      Conclusion**

For the foregoing reasons, the Court GRANTS the Defendants' Partial Motions to Dismiss (docs. 39, 40, & 42). The Plaintiff's remaining state law claims are DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: September 29, 2014